IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

DEBRA L. KENT                                        PLAINTIFF

v.                          CIVIL ACTION NO. 5:10-CV-195 DCB-RHW

VICKSBURG HEALTHCARE, LLC d/b/a
RIVER REGION MEDICAL CENTER AND
DARLENE WHITE, INDIVIDUALLY AND
IN HER OFFICIAL CAPACITY                              DEFENDANTS

## <u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the Court on Defendants' Motion for Summary Judgment [**docket entry no. 81**] and Plaintiff's Motion to Strike Portions of Defendants' Reply Memorandum and Attached Exhibits [**docket entry no. 93**]. Having carefully considered said Motions, applicable statutory and case law, and being otherwise fully advised in the premises, the Court finds and orders as follows:

## I. Facts and Procedural History

The present case arises out of Plaintiff Debra Kent's former employment with Defendant River Region Medical Center ("River Region"). River Region runs a full-service hospital in Vicksburg, Mississippi, which includes an on-site clinical laboratory. Kent Depo. at 15. The laboratory is divided into various sections with a supervisor assigned to oversee each individual section. Kent Depo. at 15-16. All supervisors report to the Administrative Laboratory Director ("Director"), who in turn reports to the Assistant Chief Executive Officer and Chief Executive Officer. <u>Id.</u>

At the time of her discharge, Kent was the Chemistry Section Supervisor, Defendant Darlene White was the Director, Lakesha Jimmerson was the Assistant CEO, and Vance Reynolds was the CEO. Kent Depo. at 15-16, 28; Reynolds Depo. at 19, 26-27.

White was hired as the Director in early December 2009 to institute a new system of accountability in the clinical laboratory.[1] Reynolds Depo. at 19-20. Both Parties agree that the environment into which White was introduced was difficult because of the staff's reluctance to change; however, the Parties disagree over the quality of White's performance. Kent Depo. at 104-05; Reynolds Depo. at 55, 72, 74. Kent characterizes White as "unqualified" and "in over her head" while the Defendants attribute White's lack of popularity to the staff's reluctance to be held to higher standards. See Defs.' Memo. at 4, docket entry no. 82; Pl.'s Memo. at 8, docket entry no. 86. Regardless of the cause, by all accounts White quickly became unpopular with some members of the staff due to her stronger management style. White Depo. at 49; Columbus Depo. at 66-68, 93-95; Reynolds Depo. at 52-53. In particular, some employees complained about her lack of diplomacy

---

[1] Kent held the position of Interim Administrative Laboratory Director immediately prior to White's appointment but chose not to apply for the position because in her words: "I didn't want that, because I knew the leadership [the former Director] had given to people, and they wanted to be kind of catered to, and I knew that I was a policy person. So I didn't want to fight that battle . . ." Kent Depo. at 104-05.

in communications and her handling of the work schedules.[2] Reynolds Depo. at 55, 72, 74; Columbus Depo. at 66-68, 93-95.

The first direct conflict between Kent and White appears to have arisen in February 2010, after Kent refused to offer needed assistance to an employee in the Blood Bank Section because Kent claimed that she was not trained in the clinical areas in which the assistance was needed. Kent Depo. at 289. As a result of this incident, White decided that each of the section supervisors would undergo cross training to avoid such situations in the future. Id. & Ex. 18; White Depo. at 113. Moreover, much to Kent's chagrin, White scheduled Kent to train first, and Kent, resenting White's scheduling decision, complained about White directly to Dr. Veena Shenoy, River Region's Pathologist and Medical Director, and also exchanged e-mails with Jimmerson,[3] stating that she believed

---

[2] In the summer of 2010, Rebecca Columbus, River Region's Human Resource Director, and Reynolds investigated certain complaints against her and determined that the complaints were largely unfounded. Reynolds Depo. at 121; Columbus Depo. at 67-68, 71-72. Specifically, Reynolds determined that the complaints were primarily attributable to the laboratory employees' resistance to the improvements White was trying to institute; nevertheless, as a result of the complaints, Reynolds and Columbus coached White on her communication skills. Reynolds Depo. at 69, 70; 114-115; Columbus Depo. at 71-72.

[3] In response to the e-mail wherein Kent expressed her reasons for believing the scheduling order exhibited racial bias, Jimmerson responded: "It is my understanding that all of the tech supervisors are being required to cross train in all areas to ensure consistent coverage in all areas no matter what supervisor is on duty. I understand Chris has also been required to cross train as well. So I would hope there is no racial motivation involved." Kent Depo. at Ex. 13.

White's scheduling order exhibited racial bias. Kent Depo. at 289 & Ex. 18. Because of this occurrence, Kent decided to begin taping conversations between her and White. Kent Depo. at 159.[4]

Not long after the cross-training conflict, on May 26, 2010, Kent again approached Dr. Shenoy–this time to report what she terms White's "backdating" of the laboratory's D-Dimer machine. Id. at 331. The record indicates that, sometime around February 2010, White used a "supervisor chip" in order to run certain tests on the D-Dimer machine to ensure that it was properly calibrated.[5] Id. at 325-29. Concerned about the propriety of this action, Kent printed out a record of recently run D-Dimer tests to substantiate her concern and showed Dr. Shenoy the printed records, which suggested that the tests had been run with an expired reagent. Id. It is not clear what Kent hoped to accomplish by presenting the tests to Dr. Shenoy; however, Dr. Shenoy appeared relatively unconcerned, likening the problem to drinking unsoured milk after the expiration date. Id. at 331.

---

[4] Apparently these recordings do not support Kent's various claims inasmuch as the Plaintiff did not submit any of them into evidence.

[5] The hospital was required under the Clinical Laboratory Improvement Amendments ("CLIA") to run certain preliminary tests on the machine to ensure the machine's accuracy. Id. at 325-29. The tests were done by running a reagent with known variables through the machine for ten days and tracking the consistency of the results. Id. The laboratory needed to run the compliance tests, but the D-Dimer machine was programmed so that it could not run an expired reagent. To overcome this obstacle, Kent used a "supervisor chip" to reset the machine to register an earlier date so that she could run an expired reagent. Id.

Around this same time, White took bereavement leave. See Kent Depo. at Ex. 9. While she was out, there was some confusion as to who was responsible for completing payroll, and Kent, who had been responsible for completing payroll when the previous director was out, begrudgingly assumed the task of completing the payroll.[6] Kent Depo. at 169-170; White Depo. at 159, 172. Before she finished payroll, however, Kent sent an e-mail to Reynolds, John Millazzo, River Region's Chief Financial Officer, Dr. Shenoy, and Lillian Harris, the payroll clerk, stating that she was working on payroll even though White failed to leave anyone in charge of the payroll before she left. Kent Depo. at 169-170 & Ex. 10. Additionally, she left a note to laboratory employees stating that any mistakes made in their paychecks were not her fault and that they should take up any issues with White upon her return. Id. at 178-79. As a result of these actions, White testified that she issued Kent a verbal warning on May 28, 2010, filled out a written warning form, and went to Columbus to have the form documented. White Depo. at 172-74 & Ex. 9. But Columbus was not in her office to document the incident.[7] Id.

---

[6] Kent did not admit or deny that it was her responsibility to complete the payroll; however, the written warning states that Kent was indeed responsible because "[t]he Lab Director had entered the PTO, breavement [sic] and EIB into Kronos prior to time off on May 20. Debra needed to complete the last 48 hours for payroll." See Kent Depo. at 178-79 & Ex. 9.

[7] Columbus did review the incident and found Kent's e-mail to be "uncooperative", "argumentative", and "combative". Columbus Depo. at 56. According to White, the form was not delivered until

5

On June 2, 2010, White and Kent experienced another conflict, this time over Kent's unwillingness to serve as the on-call supervisor for the weekend. Kent Depo. at 185-193. Specifically, White informed Kent of her on-call weekend duties, but Kent refused to act as the on-call supervisor because of an unspecified conflict and would not explain to White the nature of her conflict. Id. The situation appears to have escalated to the point where Kent called White a compulsive liar, and White responded by asking Kent to accompany her to the Human Resources Department to finish the conversation. Id.; White Depo. at 176-182. Kent refused to attend any meeting without a "witness" and convinced Dr. Shenoy to attend the meeting with her. Kent Depo. at 185-193, 196, 198. White also called Columbus to the meeting. White Depo. at 183-184. Sometime that afternoon, the group met and participated in an hour long meeting in the laboratory during which Kent explained her multiple reasons for not wanting to be on-call on weekends,[8] but eventually Dr. Shenoy convinced her that she should assent to the on-call work schedule. Kent Depo. at 202-04; Columbus Depo. at 63-66; White Depo. at 207. Kent recorded the entire meeting. Kent Depo. at 200.

Shortly thereafter, Kent had a private meeting with Columbus

_____

June 7, 2010, because White could not find a witness to attend a meeting with her before that date. Id.; Columbus Depo. at 63.

[8] According to Columbus, Kent was not the only one frustrated by having to work weekends and by White's demeanor; however, Kent comported herself differently than other employees who registered their complaints. Columbus Depo. at 67-68.

at which time she raised numerous and disparate complaints about White in addition to stating that White had "lied on several things." Columbus Depo. at 112, 119. Among the matters that the two discussed were (1) Kent's belief that White did not possess the necessary credentials to hold the position of Director as required by the CLIA,[9] (2) Kent's allegation that White had illegally backdated the laboratory tests in violation of the CLIA, (3) White's apparent refusal to furnish River Region's policies and procedure manual to all employees, and (4) White's treatment of employees. See Columbus Depo. at 119-20. Immediately after this meeting, Kent also called River Region's employee hotline and registered additional complaints about White's trustworthiness.[10] Kent Depo. at 339 & Ex. 22.

As a consequence of the June 2nd dispute, a few days thereafter White and Columbus met with Reynolds to discuss the incident.[11] Columbus Depo. at 125-127. After White and Columbus

---

[9] This allegation appears to stem from River Region's operation of a "street clinic," which is no longer in operation. Dr. Shenoy explained that the street clinic had a laboratory, which was also run by White. After an inspection, The Joint Commission determined that White was not qualified to "sign off on" certain laboratory tests for the street clinic under the CLIA, and therefore, according to Dr. Shenoy, the street clinic laboratory was shut down and all tests were run from the main laboratory at the hospital. See Shenoy Depo. 49-51, docket entry no. 86-7.

[10] White testified that she knew about the meeting but had no knowledge of what was discussed at this meeting. White Depo. at 220.

[11] Columbus testified that the meeting occurred sometime around the 4th or 5th. Columbus Depo. at 127.

apprised Reynolds of the situation, Reynolds stated that Kent should be disciplined for her behavior.[12] Reynolds Depo. at 92-94; White Depo. 218-220; Columbus Depo. at 125-127. Therefore, White filled out two written warnings, one for improperly involving Dr. Shenoy in the meeting and one for refusing to accompany her to Columbus's office. Columbus Depo. at 127. Further, because of the serious nature of the warnings, White and Reynolds agreed to be present at the meeting at which the written warnings would be administered to Kent. White Depo. at 220.

On June 7, 2010, White and Reynolds met with Kent and issued the three written warnings–one for the events dating back to May 28th and the other two stemming from the June 2nd incident. Kent Depo. at 220; White Depo. at 221-22, 225-30. The first written warning, dated May 28, 2010, cited Kent for violations of "substandard work" and "unprofessional conduct" in relation to her inappropriate payroll communications. Kent Depo. at Ex. 9. The second written warning, dated June 2, 2010, stated that Kent had committed "insubordination" for refusing to accompany White to the Human Resources Department. Kent Depo. at Ex. 11. The final written warning, dated June 3, 2010, again cited Kent for "unprofessional conduct" stemming from her decision to involve Dr. Shenoy in the

---

[12] During that meeting, Reynolds stated that if he was in White's position he would have fired Kent immediately for involving Dr. Shenoy instead of following her instructions to accompany her to the Human Resources Department. Reynolds Depo. at 92-94. Reynolds also stated the decision to discipline Kent rested with White. Id. at 92.

June 2nd meeting.[13] Id. at Ex. 12. This final written warning specifically provided that "any further misconduct will lead to immediate dismissal with [sic] the next 90 days." Id.[14]

As a result of these written warnings, on June 23, 2010, Kent filed a discrimination and retaliation charge with the EEOC, which River Region received on June 30, 2010. Columbus Depo. at 154. Then, a week later, while White was on vacation, Kent placed a completed laboratory report on White's desk which, according to White, indicated a potentially significant error with the Lipase test that could have directly impacted patient care.[15] White Depo. at 266, 270-71. White stated in her deposition that she had asked Kent–whom she had assigned the task of running the report sometime after The Joint Commission's February 2010 inspection–for the report at least twice before Kent turned it in, and White believed

---

[13] The Court understands that the third warning arose from the same incident but was, for some reason, dated one day after the incident. White testified that the dispute merited two written warnings because involving Dr. Shenoy "crossed a line." White Depo. at 205.

[14] Kent's comments provided in the "Employee Remarks" section indicate that she took issue with the charges. In response to the second warning she wrote: "It would be great if Darlene would follow Vance Reynolds [sic] policy of allowing me to discuss any unfavorable request as a team." Kent Depo. at Ex. 11. In response to the last warning, she stated: "I did not refuse to work the call schedule, I stated it was a conflict." Id. at Ex. 12. Also, White testified that after Reynolds told Kent that she should discuss any issues with her supervisor instead of involving others, Kent responded, "Hell no" and again spelled out "H-E-L-L N-O." White Depo. at 220-21.

[15] Dr. Shenoy testified that did not see the test results as a significant cause for concern. Shenoy Depo. at 90-101.

that Kent had known or should have known about the problem sometime in April 2010 but failed to call it to her attention. Id. at 280, 279-90. As soon as White received the report, she immediately contacted Columbus regarding the error and stated to her that she believed Kent's employment with River Region should be terminated. White Depo. at 271-72. After some discussion with Columbus and Reynolds, they both agreed. Columbus Depo. at 142-43; Reynolds Depo. at 138-40. Accordingly, on July 9, 2010, River Region issued an Employee Discipline Action Notice to Kent stating that her employment had been terminated for "substandard work." Kent Depo. at Ex. 13. Kent refused to sign the form but wrote at the bottom of the warning: "The [sic] is due to EEOC charge and it is okay." Id.

Exactly six months after she had been discharged by River Region, Kent filed suit in this Court against White and River Region. In her Complaint, Kent states nine separate counts, which can be reduced to the following claims: (1) Breach of Contract, (2) Race Discrimination under Title VII and 42 U.S.C. § 1981, (3) Retaliation pursuant Title VII and 42 U.S.C. § 1981, (4) Wrongful Discharge, (5) Negligent Infliction of Emotional Distress, (6) and Intentional Infliction of Emotional Distress.[16] Following discovery, the Defendants filed the instant motion with the Court, seeking summary judgment in their favor on all counts.

---

[16] This Court has original jurisdiction over the Title VII and § 1981 claims and has supplemental jurisdiction over the remaining state law claims, which arise from the same case or controversy. See 28 U.S.C. §§ 1331, 1367.

## II. Standard of Review

Summary judgment is apposite "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." Ginsberg 1985 Real Estate P'ship v. Cadle Co., 39 F.3d 528, 531 (5th Cir. 1994) (citations omitted). The party moving for summary judgment bears the initial responsibility of apprising the district court of the basis for its motion and the parts of the record which indicate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"Once the moving party presents the district court with a properly supported summary judgment motion, the burden shifts to the non-moving party to show that summary judgment is inappropriate." Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Moreover, "[t]he mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 252. Summary judgment must be rendered when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

The Court is ever mindful that summary judgment should be exercised cautiously in discrimination cases which often require courts to delve into motive and intent. Hayden v. First Nat. Bank of Mt. Pleasant, Tex., 595 F.2d 994, 997 (5th Cir. 1979). Accordingly, with regard to employment discrimination claims, courts should be hesitant to grant summary judgment based on "potentially inadequate factual presentation." Id. (citations omitted). Nevertheless, summary judgment in favor of the defendant is hardly uncommon in discrimination cases and is appropriate if the plaintiff's claim has no basis in fact. Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir. 1997).

### III. Analysis

"It is a simple fact that in a workplace, some workers will not get along with one another." McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 564 (5th Cir. 1998). Accordingly, courts are cautioned to carefully distinguish between those disputes which engender harsh feelings between the employer and employee and those

that give rise to an "actionable offense." Id. In this case, it is clear that there was discord between Kent and White, but discord alone does not form the basis of a legal claim. The core of this case is whether there is evidence to suggest that Kent and White's conflict was premised on something other than their incompatibility, i.e., whether Kent can demonstrate that the termination of her employment was in violation of state or federal law. In the Motion before this Court, the Defendants argue that there is no evidence to support any of Kent's legal claims and that they are entitled to summary judgment as a matter of law. See Fed. R. Civ. Pro. 56.

In response, Kent alleges two primary theories as to why White's actions were unlawful.[17] In support of her federal law claims, she alleges that White unlawfully discriminated against her on the basis of her race and then took retaliatory action after she registered valid discrimination complains. But as to her state law claims, she alleges that the Defendants are guilty of wrongful discharge because White fired her after she reported Kent's

---

[17] Kent raises the "cat's paw" theory of liability in her brief in response to the Defendants' Motion. See Pl.s' Memo. at 14, docket entry no. 14. This theory is inapposite in the present case because White was a final decisionmaker and made the decision, after consulting with Columbus and White, to terminate Kent's employment. See, e.g., Staub v. Proctor Hosp., -- U.S. --, --, 131 S. Ct. 1186, 1191 (2011). Thus, River Region would be liable under Title VII for White's decision. River Region has not attempted to escape liability by distancing itself from White's decision; in fact, it has argued the exact opposite, claiming responsibility for White's decisions as the final decisionmaker in the laboratory.

allegedly illegal activity (the "backdating"). These two positions are not entirely incompatible; however, because Kent oscillates between her discrimination claims, retaliation claim, and wrongful discharge claim, and further complicates the record with statements regarding White's qualifications and River Region's compliance with the CLIA, it is somewhat difficult for the Court to trace exactly what evidence Kent offers to overcome the Defendants' specific arguments as to each individual claim.

Accordingly, in an effort to allow Kent to clarify her position, the Court held a hearing on April 11, 2012, at the United States Courthouse in Natchez, Mississippi, at which time the Parties were allowed to present evidence and argument to support their positions regarding the pending dispositive Motion. At the beginning of the hearing, the Court informed Kent's counsel of its initial conclusion that, after reading the record and considering the Parties' briefs, the evidence was insufficient to warrant presentation of her case to a fact-finder, and therefore the Court was inclined to grant summary judgment for the Defendants. Accordingly, the Court instructed Kent that the hearing was her opportunity to convince the Court otherwise by offering evidence or argument in support of her (1) discrimination claim, (2) retaliation claim, and (3) and wrongful discharge claim. See March 23, 2012 Order, docket entry no. 100 (specifying what issues should be addressed at the hearing).

At the completion of the hearing, the Court again expressed its doubt that Kent had met her burden of producing evidence showing that she was disciplined or fired (1) based on her race, (2) in retaliation for her EEOC claim, or (3) because she reported White's backdating. Indeed, after reviewing portions of the record referenced at the hearing and in light of the additional evidence and arguments presented, the Court finds that Kent has failed to produce evidence to support her claims and grants summary judgment in favor of the Defendants for the reasons set out below:

**A. Breach of Contract**

The Defendants begin by arguing that Count V of the Complaint, which alleges a claim of tortious breach of contract, fails as a matter of law. The Court agrees. Kent's breach of contract claim is premised on River Region's violation of its policies and procedures as established by its employee handbook and supervisor's manual. Complaint ¶ 35. As an initial matter, this claim is only proper against River Region, not White, because there is no evidence to suggest that White and Kent's relationship was contractual. Further, per the agreement signed by Kent when she was hired by River Region, Plaintiff acknowledged the fact that she was an at-will employee and that her employment was subject to termination by River Region at any time. Thus, as an at-will employee, Kent may not maintain a breach of contract action unless she can demonstrate the applicability of one of Mississippi's exceptions to the at-will

rule.

The Defendants further argue, that to the extent that Kent has alleged a <u>Bobbitt</u> exception to her at-will-employee status, that argument also fails. "Mississippi follows the common law rule that a contract of employment for an indefinite term may be terminated at the will of either party." <u>Bobbitt v. Orchard, Ltd.</u>, 603 So. 2d 356, 360 (Miss. 1992). The Mississippi Supreme Court in <u>Bobbitt</u> created a limited exception to the common-law doctrine by holding that when an employer provides its employees with a manual establishing certain policies and procedures regarding employee discipline and discharge, it is bound to follow those policies and procedures. <u>Id.</u> at 361. The Court later stated, however, that the <u>Bobbitt</u> exception is not controlling if there is language in the employee handbook which specifically provides that it does not constitute a contract between the parties. <u>Lee v. Golden Triangle Planning & Dev. Dist., Inc.</u>, 797 So. 2d 845, 848 (Miss. 2001).

In this case, River Region's Employee Handbook contains the following disclaimer on the first page: "Nothing in this handbook or in any of the facility's policies and procedures manuals shall be deemed to constitute a contract of employment for any duration or term, and all employees of this facility are employees-at-will . . . ." Kent Depo. at 54-55 & Ex. 2. Kent signed the Handbook Receipt and Acknowledgment form that stated, "I understand that my employment with the facility will be on an at-will basis . . . . I

understand that the handbook is not contractual in nature." Kent Depo. at 53-54 & Ex. 3. Clearly then, the <u>Bobbitt</u> exception does not apply to Kent's employment with River Region, and as an at-will employee, Kent has no basis to maintain a breach of a contract action against River Region. Accordingly, the Court grants summary judgment in favor of the Defendants regarding Kent's breach of contract action.

### B. Racial Discrimination Claims

Next, the Defendants seek summary judgment on Kent's race discrimination claims arising under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, <u>et seq.</u>, and 42 U.S.C. § 1981.[18] Both statutes prohibit discrimination on the basis of race and are evaluated under the <u>McDonnell Douglas</u> burden-shifting framework. <u>Shackelford</u>, 190 F.3d at 404 n.2. Kent claims that she was treated differently that other employees because of her race. To establish a prima facie case of discrimination based on disparate treatment, a plaintiff must show: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) others similarly situated were treated

---

[18] Because Title VII and § 1981 causes of action require the same proof to establish liability, the Court will hereinafter in its analysis of these claims refer only to Title VII. <u>Shackelford v. Deloitte & Touche, LLP</u>, 190 F.3d 398, 404 n.2 (5th Cir. 1999). The Court notes that Kent may not maintain a Title VII action against White because White is not considered an "employer" for Title VII purposes. <u>See</u> <u>Indest v. Freeman Decorating, Inc.</u>, 164 F.3d 258, 262 (5th Cir. 1999).

more favorably. Ellis v. Compass Group USA, Inc., 426 F. App'x 292, 295 (5th Cir. 2011) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

In her allegations to the EEOC, Kent cited two specific factual assertions to substantiate her claim of disparate treatment: (1) she was required to complete her cross training first while Annette Gann, a white supervisor, had not finished cross training at the time she filed her initial EEOC complaint, and (2) Tammy Morris, a white technician, was not "written up" for complaining about working weekends.[19] The Defendants contend that Kent's discrimination claim based on the cross-training dispute and the incident regarding Morris cannot survive summary judgment for the simple reason that Kent cannot establish her prima facie case as to either claim.

*1. The Cross-Training Conflict*

First, the Defendants claim that "going first" does not rise to the level of an adverse employment action. In the context of Title VII discrimination claims, the Fifth Circuit has "historically held that, for all Title VII claims, [a]dverse

_____

[19] In Count IV of her Complaint, Kent alleges that she was unlawfully disciplined and terminated in violation of 42 U.S.C. § 1981. See Complaint ¶ 31. Counts I and II of the complaint allege claims of discrimination and retaliation under Title VII and § 1981 respectively, but the claims are premised on unspecified "acts and conduct as alleged herein." See id. ¶¶ 22-25. Count III alleges that the Defendants retaliated against Kent for her hotline call in violation of Title VII and violated River Region's anti-discrimination policy. Id. ¶¶ 26-29.

employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." McCoy v. City of Shreveport, 492 F.3d 551 (5th Cir. 2007) (internal quotation marks omitted). Under this rubric, the Fifth Circuit has consistently found that "[i]mposing a higher workload than that given to other employees is not an adverse employment action under title VII." Ellis, 426 F. App'x at 296 (citing Benningfield v. City of Houston, 157 F.3d 369, 376–77 (5th Cir. 1998)). Certainly "going first" does not qualify as an ultimate employment decision, but to the extent that Kent argues that she was subjected to an additional workload, that allegation also does not constitute an adverse employment action. See id. Therefore, Kent cannot maintain a discrimination claim on this basis.

   *2. The Written Warnings*

   As the Court understands Kent's argument at the hearing, however, Kent maintains that the primary basis for her discrimination argument lies either in the written warnings she received on June 7th or in the termination her employment. Kent broadly argued that if the Court considers "the totality of the circumstances" it will find that there is enough evidence to meet her prima facie case, or at least find evidence of discrimination. In support of her position, Kent relies on the Fifth Circuit opinion Mylett v. City of Corpus Cristi, in which the Court of

Appeals considered in passing whether a number of the employer's actions which individually did not constitute an adverse employment action might quality as an adverse action in the aggregate. 97 F. App'x 473, 476 (5th Cir. 2004).

Assuming, _arguendo_, that Kent is correct that the written warnings either individually or together constitute an adverse employment action,[20] Plaintiff's discrimination claim fails because there is no evidence in the record that similarly situated employees were treated more favorably. "Whether two employees are similarly situated turns not on whether their situations are 'similar' but on whether they are 'nearly identical.'" Atterberry v. City of Laurel, 401 F. App'x 869, 871 (5th Cir. 2010) (citing Williams v. Trader Publ'g Co., 218 F.3d 481, 484 (5th Cir. 2000)). Kent claims she can establish the fourth element of her prima facie case of discrimination by showing that another white supervisor, Annette Gann, was treated differently during cross training and a white bench technician, Tammy Morris, was not disciplined for complaining to Dr. Shenoy.

---

[20] The Court makes no finding on this issue but notes the inconsistent precedent regarding whether a written warning constitutes an adverse employment action. The Defendants cite Preston v. Texas Department of Family and Protective Services for the proposition that "[w]ritten admonishments do not rise to the level of ultimate employment actions." 222 F. App'x 353, 358 (5th Cir. 2007). Kent counters with her own case law which suggests that a formal reprimand is indeed an "ultimate employment decision" sufficient to constitute an adverse employment action. Alvarado v. Tex. Rangers, 492 F.3d 605, 612 (5th Cir. 2007); Breaux v. City of Garland, 205 F.3d 150, 157 (5th Cir. 2000).

First, Gann, whom Kent calls the "true comparator," cannot be used as a similarly situated employee for Kent's discrimination claim in connection with the written warnings. Kent must identify similarly situated individuals who did not receive *written warnings* for conduct similar to that which she exhibited while completing payroll and on June 2, 2010. These incidents are unrelated to the cross-training scheduling, yet Kent's discrimination argument with respect to Gann pertains strictly to the cross-training conflict, not the written warnings. Therefore, Gann cannot qualify as a comparator for Kent's discrimination claim with respect to the written warnings. In reaching this conclusion, the Court notes that Kent's attempt to connect the written warnings with her complaints to Jimmerson about cross training is really a *retaliation* claim, and this allegation is addressed below.

The heart of Kent's *discrimination* claim with respect to written warnings is that Morris was not disciplined for complaining to Dr. Shenoy about White while Kent was issued a written warning for the same behavior. This assertion lacks both legal merit and factual support. First, for the purposes of a discrimination claim, there is a distinction between a supervisor and subordinate to "establish that two persons are not similarly situated." Amezquita v. Beneficial Tex., Inc., 264 F. App'x 379, 386 (5th Cir. 2008) (citing Wyvill v. United Cos. Life Ins. Co., 212 F.3d 296, 302-03, 305 (5th Cir. 2000)). Therefore, the law dictates that Morris, who

held a position subordinate to Kent's, cannot be used as a comparator. Further, the two situations raised by Kent are not comparable. Kent mischaracterizes the facts by asserting that she was merely complaining to Dr. Shenoy. The record in this case demonstrates that Kent was disciplined for involving Dr. Shenoy in an administrative matter on June 2nd and refusing to accompany White to the Human Resources Department. See Kent Depo. at Ex. 12. Morris, it appears, simply complained to Dr. Shenoy outside the presence of White–something that Kent herself did at least once without receiving any written warning–and there is no evidence that White was ever aware of Morris's complaint. See Kent Depo. at 273, 331. In short, Kent's claim with respect to Morris does not constitute favorable treatment because the situations are not comparable.

*3. Termination of Employment*

Kent's last discrimination argument is related to the termination of her employment, claiming that she was treated more harshly than other similarly situated employees who committed less severe indiscretions. The Defendants argue that Kent did not include this claim in her EEOC charge and therefore it is barred.[21]

---

[21] At the April 11, 2012 hearing, the Court asked the Defendants to clarify their position as to whether Kent was barred from bringing a discrimination claim on this basis because she failed to allege that the termination of her employment was based on discrimination in her EEOC complaint. The Defendants did not retract their argument with respect to the Plaintiff's Title VII discrimination claim but stated that the Plaintiff's § 1981 action

"Courts have no jurisdiction to consider title VII claims as to which the aggrieved party has not exhausted administrative remedies." Clayton v. Rumsfeld, 106 F. App'x 268, 271 (5th Cir. 2004) (citations omitted). The purpose for requiring exhaustion is to allow the administrative agency the opportunity to instigate and resolve any claims of discrimination. Id. Thus, a Title VII suit "'may extend as far as, but not further than, the scope of the EEOC investigation which could reasonably grow out of the administrative charge.'" Id. (quoting Fine v. GAP Chem. Corp., 995 F.2d 576, 578 (5th Cir. 1993)). To determine whether a reasonable EEOC investigation could grow out of an administrative charge, courts focus on the factual statements contained in the charge. Id. (citing Sanchez, 431 F.2d at 462). Courts view factual statements in the broadest reasonable sense, considering whether the employer is put on notice of the existence of the nature of the charges. Id. (citing Manning v. Chevron Chem. Co., 332 F.3d 874, 878-89 (5th Cir. 2003)).

In her initial EEOC charge, Kent alleged two of the three purportedly relevant facts she now raises in support of this claim. Her initial EEOC charge referenced both the cross-training dispute and the fact that Morris was not "written up" for complaining to Dr. Shenoy. See EEOC Charge, docket entry 1-2. When she amended her

would still be live regardless of how the Court rules on the "Sanchez" issue. See Sanchez v. Standard Brands, Inc., 431 F.2d 455, 462 (5th Cir. 1970).

charge after she was terminated, she only alleged that her termination was tied to her pending EEOC charge, thus suggesting a retaliation claim; however, the salient fact in the amendment was that she had been dismissed from River Region. Taking the two initial facts in light of Kent's later amendment stating that she had been fired, and reading both EEOC charges in the "broadest reasonable sense," the Court concludes that the EEOC and River Region considered the issue of whether the termination of Kent's employment had anything do to with her race. Clayton, 106 F. App'x at 271. Based on this rationale, the Court finds that Kent's discrimination claim in connection with her termination is properly before this Court.

The Court agrees with the Defendants, however, that any reference to Tammy Allement–the similarly situated white employee offered in support of this claim–is barred. Kent states that when she was the Interim Laboratory Director she discovered that Allement, another white bench technician, was destroying documents, and she chose to give Allement a verbal warning instead of terminating her employment. Id. at 355-356. She compares this situation to the circumstances surrounding her dismissal, essentially arguing that White should have warned her, instead of terminating her employment, for what she deems behavior less severe than Allement's. Id. at 356. Yet, Kent did not mention this incident to the EEOC, and the Court finds that neither the EEOC nor

River Region would have reasonably considered this event both because it occurred well before Kent's other accusations, and more importantly, before White worked at River Region. Id. at 335.

Without any reference to Allement, Kent cannot establish the fourth element of her prima facie case because she cannot identify a similarly situated employee who was treated more favorably. Therefore, Kent's Title VII claim in this regard fails as a matter of law. Kemp's attempt to use Allement as a similarly situated employee is not barred as to Kent's § 1981 discrimination claim, which is not required to be presented to the EEOC, but Kent's comparison of the events surrounding her dismissal to the situation involving Allement lacks merit. While the actions taken by Kent in choosing not to discipline or fire Allement for throwing away records may demonstrate her magnanimity, it is not evidence that White committed a discriminatory act by firing her after she turned in her report. If anything, the difference in the act demonstrates the differences in philosophy and management style of the two River Region employees, which, as the Court stated at the outset, appears to be at the heart of the dispute. Regardless of the cause, the Court concludes that the Plaintiff has not established a prima facie case to support her claim that she was fired because of her race and therefore cannot maintain a discrimination action. To be clear, the Court reaches this decision based on the merits of Kent's § 1981 and Title VII discrimination claims, with the limited

exception regarding Allement and the Title VII claim.

*4. Evidence of Pretext*

Although it unnecessary for the Court to proceed to the final stages of the burden-shifting test, the Court states, for the record, that the Defendants have produced a legitimate nondiscriminatory reason for terminating the Plaintiff's employment. See Kent Depo. at Ex. 13. At the hearing and in her briefs, Kent raises a factual issue of whether the report was turned in on time in the hope that she can demonstrate pretext by exposing the falsity of the Defendants' explanation for the decision.[22] See Alvarado, 492 F.3d at 611. The issue with the report, however, was not its timeliness but the information it contained. See Kittling v. Centennial Beauregard Cellular, L.L.C., 447 F. App'x 614, 617 (5th Cir. 2011) (rejecting the Plaintiff's attempt to mischaracterize the reasons for her termination). The report indicated that Kent knew or should have known that the laboratory was out of compliance with "verification of reportable range regulations" as early as April 2010 but failed to communicate this issue to White until she turned in the report on June 30, 2010. Reynolds Depo. at 138-141; Columbus Depo. at 132-136; White

---

[22] It appears from the record that the report was due on June 30, 2010, the date Kent turned in the report. Second White Depo. at 52, docket entry no. 91-3. The record indicates that White wanted the report for the information it contained, and asked for it earlier, but in a meeting on June 15, 2010, she told Kent she could have until the end of the month to turn in the report. Id.

Depo. at 270-272, Ex. 28, p. 6-7, Ex. 30. In other words, the Defendants' position is that Kent, by virtue of her responsibility to produce this report, should have called this problem to White's attention earlier than she did.

Kent, despite her attempts to recharacterize the reasons for her termination, has offered no evidence to rebut the Defendants' claims (1) that she had knowledge of the problem about which the Defendants were concerned or (2) that a problem existed. Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 220 (5th Cir. 2001) (stating that the plaintiff has the burden to overcome the employer's nondiscriminatory reasons). Kent does suggest the problem was easily corrected, but the fact that there was an easy remedy does not rebut the seriousness of the problem. Shenoy Depo. at 91, 97. In short, the Court finds the Kent has not offered evidence to show that the Defendants' proffered reason for terminating her employment is false.

Further, there is no evidence that White or River Region acted with a "mixed motive." Rachid v. Jack In The Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004). More specifically, there is no evidence that race was a motivating factor in White's decision to dismiss Kent, or for that matter, in any of her other decisions to discipline Kent. See id. The cross-training incident is the origin of all Kent's discrimination claims. Kent stated that she "felt like" it would have been better to schedule Gann to train before

27

her and Temekia Felton, another black supervisor. Kent Depo. at 116-17. As stated above, having to "go first" does not rise to a level of an adverse employment action subjecting the Defendants to a Title VII claim. But not only is having to go first not an adverse action, it is not evidence of racial animus. Being first or last in this circumstance is a simple matter of personal preference.[23]

Moreover, there is no evidence that Kent was required to train first because of her race. Kent makes much of the fact that Gann was scheduled to go last but overlooks other evidence in connection with the scheduling which belies her discrimination argument. Even if the Court assumed that White's reasons for scheduling Gann last were untrue,[24] the record indicates that there were only four laboratory supervisors employed at River Region, three of whom were black: the Plaintiff, Temekia Felton, and Chris Jones. The Court understands that Felton was scheduled for training second but left River Region before she was trained. Jones was not scheduled for

_____

[23] For example, Gann could just as easily argue that she was subjected to discrimination by being made to "go last." There is also some suggestion in the record that cross training required extra work; however, according to the record, all supervisors were or were to be scheduled for cross training at some point; therefore, the extra work in relation to the other supervisors was not "extra." Chris Jones's testimony at the hearing was that Gann is currently completing her training. It is not clear what training Chris Jones received since she was trainer.

[24] White stated that she scheduled Gann to train last because Gann's section was on Family and Medical Leave Act leave. See White Decl. ¶ 4. Kent has not rebutted this assertion.

cross training because she, as the head of the Hematology
department–the department in which the employees had to cross train
first–was responsible for training the others.[25] Accordingly, prior
to Felton's resignation, it was probable that one black employee
would be required to train first and not unlikely that Gann would
be scheduled to go last. Without some evidence, the Court cannot
conclude that White's scheduling decisions could reasonably be
considered by a fact-finder to exhibit racial bias.[26]

Similarly, none of the other events about which Kent complains
indicate White or River Region treated Kent differently on the
basis of race. As stated above, it appears that many employees–both
white and black–complained to Dr. Shenoy and to the administration

---

[25] It is not clear whether Chris Jones ever trained in another
department although, per Jimmerson's e-mail, she was supposed to be
scheduled to train. See Kent Depo. at Ex. 13. The fact that the
schedule was changed sometime after Kent complained does not amount
to evidence that Kent's complaints were well-founded–as Kent
appeared to suggest at the hearing–although it may indicate that
River Region was sensitive to the seriousness of the charges. There
is no testimony in the record as to why the schedule was changed,
but the scheduling change in which Gann was moved ahead of Felton
is not evidence of racial bias.

[26] As the Court noted in the hearing, if anything, it is more
likely that the scheduling decision indicates that White and Kent
were at odds. In order to underscore this point, the Defendants
cross-examined Chris Jones at the hearing, and she testified that
she had never been disciplined by White. In fact, there is
testimony in the record suggesting that the cross-training decision
was based on Kent's refusal to help out in the Blood Bank Section
and therefore it would be natural for White to ask Kent to train
first. See Kent Depo. at Ex. 18 (suggesting that Dr. Shenoy told
Kent that the cross-training idea probably arose from Kent's
refusal to help in the Blood Bank Section on February 13, 2010).

about White's management style.[27] Kent's behavior, however, went far beyond registering simple complaints. All the evidence in the record indicates that Kent, for whatever reason, consistently and relentlessly challenged White's authority as supervisor and was disciplined and eventually terminated for her "unprofessional" and "insubordinate" conduct and her "substandard" work. For this additional reason then, i.e., lack of pretext, the Court finds that the Defendants are entitled to summary judgment as to Kent's discrimination claims.

### C. Retaliation Claims

Kent further alleges that she was retaliated against for (1) complaining about the cross-training schedule to Jimmerson in an e-mail, (2) registering a hotline complaint, and (3) filing her EEOC charge. Here again, the Defendants argue that the Plaintiff cannot establish a prima facie case of retaliation in regard to any of the actions about which she complains. Similar to a discrimination claim, a retaliation claim is evaluated under the McDonnell Douglas burden-shifting framework. To make out a prima facie case of retaliation, a plaintiff must show: "(1) that [she] engaged in activity protected by Title VII, (2) that an adverse employment

---

[27] For example, Kent's attorney asked Columbus the following question: "Were you aware that within the lab that there were some issues relating to race?" She answered, "After discussing with the employees, it was pretty uniform across the board, blacks and whites both had issues with Darlene's communication style and scheduling. So I did not–I did not associate it as being a race-related issue." Columbus Depo. at 95.

action occurred, and (3) that a causal link existed between the protected activity and the adverse action." Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002) (quoting Raggs v. Miss. Power & Light Co., 278 F.3d 463, 471 (5th Cir. 2002)).

*1. E-mail and Hotline Complaint*

Careful consideration of binding precedent compels the Court to conclude that in the context of a retaliation claim the written warnings issued to Kent on June 7th do not rise to the level of an adverse employment action. The Supreme Court in Burlington Northern and Santa Fe Railway Co. v. White defined an adverse employment action in the context of retaliation claims as one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 68 (2006) (quotations omitted). Applying this holding, the Fifth Circuit concluded that a written warning which fails to dissuade a plaintiff from filing an EEOC charge does not constitute an adverse employment action as defined by the Supreme Court. DeHart v. Baker Hughes Oilfield Operations, Inc., 214 F. App'x 437, 442 (5th Cir. 2007). It is clear that the written warnings, whatever their effect, did not deter Kent from making claims of discrimination and therefore Kent cannot make out her prima facie case because the written warnings do not rise to the level of an adverse employment action.

Further, even if the written warnings could constitute an adverse action, Kent's claims regarding the e-mail and the hotline

complaint fail for additional reasons. First, Kent cannot show a causal link between the written warnings and the e-mail. There is no evidence in the record to suggest that White, or any other River Region employee for that matter, was aware of Kent's e-mail to Jimmerson. Moreover, temporal proximity, a potentially useful factor in establishing a causal link, see infra, is of no help to Kent because she sent her e-mail to Jimmerson some three months before the written warnings were issued. Too much time elapsed for the Court to infer a causal link from timing alone. Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (per curiam).

As to the hotline complaint, it did not constitute a protected activity. The record indicates that the complaints registered by Kent were vague and did not specifically allege any unlawful employment practice. The Fifth Circuit has "consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity." Davis v. Dallas Indep. Sch. Dist., 448 F. App'x 485, 493 (5th Cir. 2011). All the evidence in the record indicates that the written warnings were issued solely for Kent's actions after she completed payroll and for her confrontational behavior on June 2, 2010. Kent's retaliations claims fail as to these two activities because she cannot demonstrate her prima facie case.

*2. Termination of Employment*

With respect to the termination of Kent's employment,

dismissal is obviously an adverse employment action and filing an EEOC claim is a protected activity under Title VII; therefore, the question here is one of causation. Kent proposes two factors that suggest the filing of the EEOC claim caused the termination of her employment: (1) temporal proximity and (2) Columbus's knowledge of the EEOC Complaint. In their briefs, the Defendants appear to concede that the timing of the events is sufficient to establish a causal link, thus completing Kent's prima facie case, but argue that Kent cannot demonstrate "but for" causation and therefore cannot show pretext under the final stage of the McDonnell Douglas burden shifting test. Defs.' Memo. at 22, docket entry no. 82.

In the context of retaliations claims, the McDonnell Douglas burden-shifting framework requires a plaintiff to twice address causation. First, to establish a prima facie case, a plaintiff must demonstrate a causal link between the protected activity and the adverse employment action. Gee, 289 F.3d at 345. Having done so, if the Defendant responds with a legitimate, non-retaliatory reason for the plaintiff's termination, as is required under the second stage of burden-shifting test, the onus is once again shifted back to the Plaintiff—this time to demonstrate pretext. See, e.g., Strong v. Univ. Healthcare Sys., L.L.C., 482 F.3d 802, 806 (5th Cir. 2007). To show pretext in the context of a retaliation claim, a plaintiff must produce evidence that he or she would not have been fired "but for" his or her engagement in the protected activity. Nunley v. City of Waco, 440 F. App'x 275, 280 (5th Cir.

33

2011) (citations omitted). Meeting the but-for causation standard is more difficult than showing a causal link because at the final stage the plaintiff must rely on evidence rather than inference. Moore v. Delta Airlines, Inc., 2012 WL 685414, at *10 (N.D. Tex. Mar. 1, 2012) (citing Evans v. City of Houston, 246 F.3d 344, 352 (5th Cir. 2001)).

In the context of this burden-shifting framework, case law establishes that temporal proximity may be sufficient evidence of a causal link between the protected activity and the adverse action when the events are "very close." Breeden, 532 U.S. at 273. Even if the events are very close, a court may consider whether surrounding circumstances overcome the inference that there is a causal link. Moore, 2012 WL 685414, at *10. Temporal proximity alone may not, however, be used by a plaintiff to establish but-for causation. See, e.g., Strong, 482 F.3d at 808. Timing may be considered by the court as one factor among many, but at the final stage the plaintiff must produce other evidence that demonstrates that the protected activity caused the retaliatory act of which he or she complains. Roberson v. Alltel Info. Servs., 373 F.3d 647, 656 (5th Cir. 2004).

In this instance, there is no question that the two events are closely related in time—the relevant events being separated by ten days—but in this case, the timing is at the very least neutralized in light of the way the events unfolded. See Moore, 2012 WL 685414, at *10 ("intervening events . . . can weaken the causal link where

such events provide a legitimate basis for the employer's action."
(citing two Tenth Circuit cases)). First, White issued Kent three
warnings on June 7th, one of which clearly indicated that any
further misconduct would result in dismissal. This notification was
given prior to Kent's decision to file an EEOC charge and before
Columbus received notification of this charge. Columbus Depo. at
154. Not long after this written warning was administered and
shortly after the EEOC charge was received by River Region, Kent
turned in a report, which, according to White, indicated that the
laboratory was not in compliance with the standards of The Joint
Commission. Kent Depo. at Ex. 13. Immediately upon receiving the
report, White approached Columbus to discuss the termination of
Kent's employment. White Depo. at 271-72. Therefore, the timing of
Kent's dismissal coincided more closely with White's receipt of
Kent's report than it did with River Region's receipt of the EEOC
charge.

Viewing this timing as neutral, the Court concludes that the
Plaintiff, as the nonmoving party, is entitled to the favorable
inference that a causal link exists, Liberty Lobby, Inc., 477 U.S.
at 255 (1986); however, the Court also finds that the Plaintiff
cannot show pretext. The Defendant dismissed Kent for "substandard
work" in connection with her failure to report a potentially
significant error with the Lipase test, which, as discussed above,
qualifies as a legitimate, non-retaliatory reason for dismissing
the Plaintiff. But there is no direct or circumstantial evidence in

the record to show that Kent would not have been fired but for her EEOC charge. Significantly, White, who made the decision to fire Kent, denies any knowledge of the EEOC complaint and denies firing Kent based on the EEOC charge. Moreover, Columbus testified that she did not mention the charge to White during her investigation. White Depo. at 242; Columbus Depo. at 152-54.

In light of this testimony, at the hearing the Court asked Kent's attorney whether Kent believed that White had any knowledge of her EEOC charge prior to terminating her employment, and if so, what evidence Kent had to support that belief. Kent's attorney responded that White knew because Columbus learned of the charge on June 30, 2010, and sometime thereafter Reynolds became aware of the charge. After learning of the charge, Columbus contacted White to question her regarding the cross-training incident, which was raised in the EEOC report. Kent infers from this conversation that Columbus must have informed White why she was inquiring into this incident, even though Columbus has expressly denied this claim. Columbus Depo. at 152-54.

This speculation is not enough to create a genuine issue of material fact. See Brown v. City of Hous., Tex., 337 F.3d 539, 541 (5th Cir. 2003). If the Court concluded from this information that "but for" Kent's complaint she would not have been fired, the Court would be required to make a double inference. First, the Court would have to accept the Plaintiff's theory that White and Columbus discussed the EEOC charge. If the Court could accept this

premise–which it cannot without evidence–White's knowledge of the EEOC charge alone is not enough to show but-for causation. See Williams v. AT & T Inc., 356 F. App'x 761, 767-68 (5th Cir. 2009) (stating that an employer's knowledge that an administrative claim has been filed is not enough to raise a genuine issue of material fact as to causation). The Court would then have to find that it is reasonable for a fact-finder to conclude that White's knowledge of the EEOC charge caused her to terminate Kent's employment despite any evidence to support this claim. Without any evidence to support either inference, the Court finds that the timing of the events–while just enough to establish a causal link–is not sufficient show that the Defendants' legitimate and reasonable explanation for terminating her employment is a pretext for retaliation. Therefore, the Court must grant summary judgment to the Defendants as to all of Kent's retaliation claims.

### D. Wrongful Discharge

In Count VI of the Complaint, Kent moves away from her discrimination and retaliation claims to allege an entirely different theory as to why her employment with River Region was terminated. Complaint ¶ 37. Kent claims that she was fired because she reported White's backdating to Dr. Shenoy and Columbus. The Mississippi Supreme Court in McArn v. Allied Bruce-Terminix Co., Inc. created a narrow public policy exception to Mississippi's at-will-employment rule in situations where an employee is fired because he or she refuses to participate in an illegal activity or

is discharged for reporting illegal acts of his or her employer. 626 So. 2d. 603, 607. Kent argues that the McArn exception applies in her case and therefore the Defendants are guilty of wrongful discharge. The Defendants offer three arguments in response to this claim: (1) there is no evidence that White's activity was illegal; (2) there is no suggestion that Kent reported the activity because she believed it was illegal; and (3) there is no evidence that White was aware of Kent's complaints.

At the hearing, the Court invited the parties to address the possibility of whether White's activity was criminal, and more significantly, whether the situation is one that would merit application of the McArn doctrine. See Jones v. Fluor Daniel Servs. Corp., 959 So. 2d 1044, 1048 (Miss. 2007). After considering Kent's argument presented at the hearing and the case law cited by the Defendants, the Court finds it unnecessary to address the legality of White's actions, because assuming that the McArn exception does apply, the Court finds no evidence in the record that White was ever aware that Kent was complaining about her backdating to Dr. Shenoy and Columbus.[28] Therefore, White could not have fired Kent

---

[28] Kent cited 42 C.F.R. § 493.1806(e) which clearly provides: "Under section 353(1) of the PHS Act, an individual who is convicted of intentionally violating any CLIA requirement may be imprisoned or fined." However, the Fifth Circuit in a similar circumstance cautioned: "Since almost every aspect of the workplace is governed by regulations of some sort, expanding the McArn exception to encompass the alleged violations urged by [the plaintiff] would work a significant change in Mississippi labor law." This Court also is skeptical as to whether a violation of a CLIA regulation is a situation which the McArn Court had in mind

because she reported the allegedly illegal activity.

All parties acknowledged that White was not aware of Kent's allegations. Kent herself testified that she did not know whether her termination had anything to do with her reporting the D-Dimer issue. Kent Depo. at 337-38 ("I can't say that I know that . . . "). Dr. Shenoy, to whom Kent first complained about this issue, appears to have dismissed its importance and certainly did not confront White on this issue. Id. at 331. Columbus also learned of the backdating from Kent and similarly seemed unconcerned. See Columbus Depo. at 119-23. In fact, she chose not to act on this information at all. Id. White, for her part, testified that she never knew that Kent was complaining about the incident. White Depo. at 140. In short, there is no evidence in the record to suggest that White was ever aware of Kent's behavior, and even if she was, there is no evidence that White made the decision to fire Kent based on the complaints. Therefore the Court grants summary judgment in favor of the Defendants as to this claim.

**E. Emotional Distress Claims**

Finally, in Counts VII and VIII of her Complaint, Kent asserts claims for negligent infliction of emotional distress and

---

when it created its "narrow public policy exemption." McArn, 626 So. 2d at 607. But because the question of whether a violation of a federal regulation merits a McArn exception is uncertain under Mississippi law and because there is no factual support for Kent's McArn claim, the Court declines to forge new ground on this state law issue.

intentional infliction of emotional distress. With respect to the
negligent infliction of emotional distress claim, the Defendants
argue that they are entitled to summary judgment because it is
barred by the exclusivity provisions of the Mississippi Workers'
Compensation Act ("MWCA"). <u>See</u> Miss. Code Ann. § 71-3-9. As to the
claims of intentional infliction of emotional distress, the
Defendants argue that the claim is frivolous because White's
behavior does not rise to the level of conduct "so outrageous as to
be utterly intolerable in a civilized community." <u>White v. Walker</u>,
950 F.2d 972 (5th Cir. 1991) (quotations omitted). Kent offered
little in her briefs to rebut these claims.

As a matter of law, the Defendants are correct that Kent's
allegations of negligence must be brought pursuant to MWCA. Miss.
Code Ann. § 71-3-9. In a similar situation, this Court previously
stated, "The Supreme Court of Mississippi has long recognized that
[the MWCA] 'immunizes employers and co-employees for liability
under common law negligence.'" <u>Bailey v. Cooper Lighting, Inc.</u>,
2008 WL 1868568, at *5 (S.D. Miss. Apr. 24, 2008) (quoting <u>Russell
v. Orr</u>, 700 So. 2d 619, 626 (Miss. 1997)); <u>see also</u> <u>Benoit v.
Bates</u>, 2010 WL 4637672, at *4 (S.D. Miss. Nov. 8, 2010) ("[A]ny
state tort claim grounded in negligence is barred by the Workers'
Compensation Act."). There is no question that Kent's only recourse
for her negligence claim against River Region is under the MCWA.
Likewise, case law is clear that when managers or supervisors act

within the scope or their employment, they too are shielded by the MWCA from common law negligence action. Griffin v. Futorian Corp., 533 So. 2d 461, 464 (Miss. 1998) (citing Sawyer v. Head, 510 So. 2d 472 (Miss. 1987); Brown v. Estess, 374 So. 2d 241 (Miss. 1979); McCluskey v. Thompson, 363 So. 2d 256 (Miss. 1978)). At all times in her dealings with Kent, White acted within the scope of her employment, and therefore any negligence claim against her is subsumed by the MWCA.

To establish a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that the defendant's conduct was "'wanton and wilful and it would evoke outrage or revulsion.'" Speed v. Scott, 787 So. 2d 626, 630 (Miss. 2001) (quoting Leaf River Forest Prods., Inc. v. Ferguson, 662 So.2d 648, 659 (Miss. 1995)). The Mississippi Supreme Court has stated that meeting the requisites of an intentional inflection of emotional distress is a tall order. Speed, 787 So. 2d 626, 630 (Miss. 2001) (citing Jenkins v. City of Grenada, 813 F. Supp. 443, 446 (N.D. Miss. 1993)). Moreover, a cause of action for intentional infliction of emotional distress rarely lies in run-of-the-mill employment disputes. Nuwer v. Mariner Post-Acute Network, 332 F.3d 310, 316 (5th Cir. 2003) (quoting Lee v. Golden Triangle Planning & Dev. Dist., Inc., 797 So. 2d 845, 851 (Miss.2001)); see also Harris v. Greenville Riverboat, LLC, 2011 WL 3806250, at *8 (N.D. Miss. Aug. 29, 2011).

Kent's intentional infliction of emotional distress claim is

meritless. There is no evidence that the Defendants' actions "exceeded the bounds of decency" or could be regarded as "utterly intolerable in a civilized community," and therefore they fall short of the outrageous and revolting conduct necessary to sustain an intentional infliction of emotional distress claim. <u>Speed</u>, 787 So. 2d 626, 630 (Miss. 2001) (quoting <u>Peques v. Emerson Elec. Co.</u>, 913 F. Supp. 976, 982 (N.D. Miss. 1996)). Instead, the record suggests nothing more than an ordinary employment dispute. Accordingly, the Court grants summary judgment for the Defendants on this final claim.

## IV. Conclusion

Having carefully examined the record in this case, the Court finds no evidence of a genuine dispute of material fact sufficient to present any of the Plaintiff's claims to a fact-finder. Accordingly, pursuant to Federal Rule of Civil Procedure 56, the Court finds that the Defendants are entitled to summary judgment as a matter of law as to all of the Plaintiff's claims. Additionally, because the Court did not rely on any of the evidence or argument that the Plaintiff moved to strike, Plaintiff's Motion to Strike [docket entry no. 93] will be dismissed as moot.

Accordingly,

**IT IS THEREFORE HEREBY ORDERED** that Defendants' Motion for Summary Judgment [**docket entry no. 81**] is **GRANTED**. A separate final judgment dismissing the present cause **WITH PREJUDICE**

will be issued forthwith in accordance with Federal Rule of Civil Procedure 58.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Portions of Defendants' Reply Memorandum and Attached Exhibits [**docket entry no. 93**] is **DISMISSED** as moot.

**SO ORDERED,** this the 30th day of April, 2012.

   /s/ David Bramlette      

**UNITED STATES DISTRICT JUDGE**
